IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 21-54 |
| | : | |
| QUINTEL MARTINS, et al. | : | |

### MEMORANDUM

**Chief Judge Juan R. Sánchez**                                                     **July 15, 2022**

      Defendants Quintel Martins and DeAndre Jackson move to suppress physical evidence recovered during a traffic stop and search of their car. Because police officers recovered cell phone evidence pursuant to a search warrant that was issued based on this physical evidence, the Defendants seek to suppress that evidence as well.[1] Finally, Jackson also seeks to suppress testimonial evidence of statements he made to officers at the scene. The traffic stop and temporary detention in this case were lawful. Soon after detaining the Defendants, the officers on the scene developed probable cause to search the passenger compartment and trunk of the car. Because there were no Fourth Amendment violations, the Motions will be denied.

---

[1] The Defendants are charged by indictment with conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); two counts of interference with interstate commerce by robbery and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) & 2 (Counts 2 & 4); and two counts of using, carrying, and brandishing a firearm in relation to a crime of violence and aiding and abetting, in violation of 18 U.S.C. §§ 924(c) & 2 (Counts 3 & 5). Quintel Martins and DeAndre Jackson filed the instant motions to suppress on October 7, 2021, and February 28, 2022. The Government filed a response in opposition to both motions. The Court conducted a suppression hearing on April 1, 2022.

**FINDINGS OF FACT**

1. On October 1, 2019, Officer Thayer McCauley of the Collingdale Police Department was working an overnight patrol shift. He was the only officer in his marked police car.[2]

2. Collingdale is a borough in Delaware County that straddles MacDade Boulevard, which is an active commercial road with residential neighborhoods on either side.

3. At approximately 1:10 a.m. on October 2, 2019, Officer McCauley saw a red Nissan Altima driving southwest on MacDade Boulevard. The car had a broken taillight, a damaged Massachusetts license plate, and a scratched registration tag. Officer McCauley pulled behind the car at a red light at the intersection of MacDade Boulevard and Clifton Avenue. He entered the car's information into the NCIC database, which is a county-wide system used by law enforcement agencies to track and verify information about vehicles, firearms, and suspects.

4. When the traffic light turned green, the Nissan entered a Wawa gas station and the driver got out of the car to pump gas. Officer McCauley pulled into a vacant lot next to the gas station to review the NCIC results. In addition to the broken taillight, the car's registration was expired, and the tag was not assigned to a particular vehicle make or model.

5. The Nissan left the parking lot and Officer McCauley turned onto MacDade Boulevard to stop the car. However, the Nissan crossed MacDade Boulevard at a high rate of speed and made several quick turns through a residential neighborhood. Officer McCauley was unable to catch up and quickly lost sight of the car.

---

[2] Officer McCauley was supervising a trainee during this shift. However, trainees are not armed and may not engage with suspects. During a traffic stop, a trainee may not exit the vehicle.

6. At approximately 1:50 a.m., Officer McCauley was driving southwest on MacDade Boulevard when he saw the red Nissan a second time. The Nissan was traveling in the opposite direction. Officer McCauley made a U-turn to stop the car. As soon as he did so, the car turned off MacDade Boulevard onto Pine Street. The section of Pine Street onto which the Nissan turned has a dead end.

7. The car stopped at a vacant lot at the end of Pine Street between a small grocery store, which was closed for the night, and an auto repair shop, which was permanently closed at the time. Officer McCauley parked behind the Nissan, pointed his spotlight towards the car, and began issuing commands to the driver.

8. Officer McCauley ordered the driver to put his hands out of the window. Officer McCauley then exited his car and ordered the occupants to remain still until more officers arrived. Officer McCauley called for backup on his police radio as he remained by his car. He told the dispatcher there were at least three occupants in the vehicle.[3] Officer McCauley stayed by his car until other officers arrived.

9. The second officer arrived on the scene approximately 25 seconds later, or 50 seconds after the stop began. Officer McCauley, with his weapon drawn, ordered the driver (Quintel Martins) to exit the car and walk backwards. Officer McCauley ordered the other officer to put Martins in handcuffs. Officer McCauley then ordered Winfield and Jackson to do the same, one at a time.

10. The officer who detained DeAndre Jackson was Deputy Kenneth Baker. Deputy Baker asked Jackson several questions, including whether Jackson had anything on his person that

---

[3] Defendant Quintel Martins was the driver, Christopher Winfield was the front seat passenger, and DeAndre Jackson was the rear passenger.

3

would poke him or stab him. These are standard questions for an officer to ask while detaining a suspect. As Deputy Baker put Jackson in handcuffs and patted him down, he felt a hard metal object in Jackson's pocket. He asked Jackson about the object, and Jackson told him it was a gun magazine. Jackson also told Deputy Baker there was a gun in the vehicle's rear cupholder. Deputy Baker asked if Jackson had a concealed carry permit, and Jackson responded that he did not.

11. Deputy Baker went into the back seat to retrieve the gun. He removed the magazine, cleared the chamber, and placed the gun on the roof of the car.

12. While Deputy Baker cleared the gun, Officer McCauley instructed Officer Kai Greene, Officer Matthew Barr, and Deputy Baker to check the car for additional occupants. Although Officer McCauley initially told dispatch there were three individuals in the car, he had not yet approached the car and was not certain whether there was a fourth person in the car. The officers searched the vehicle from the outside and confirmed it was empty.

13. Approximately three minutes after the stop began, at least five officers in total had arrived on the scene, all three occupants were detained, and the car was idling with three doors open. The three Defendants were seated next to Officer McCauley's car and away from the Nissan.

14. While Deputy Baker was inside the rear area of the car clearing the gun, he smelled an odor of marijuana.[4] Based on his training and experience, Deputy Baker credibly testified that the odor was that of fresh marijuana. The officers searched the passenger compartment but did not find any drugs, paraphernalia, or any contraband other than Jackson's illegally concealed gun.

15. Deputy Baker also testified credibly that the odor was more potent towards the rear of the car. Deputy Baker believed, based on his observations at that point in time, that there was

---

[4] Having observed Deputy Baker's demeanor on the stand and answers to questions on cross examination, the Court finds Deputy Baker credible.

marijuana in the trunk. After searching the trunk, the officers found a large plastic bag filled with small vials, a mason jar, plastic bags, a scale, latex gloves, and a second firearm. The officers also found several distinctive items of clothing, including ski masks. This clothing was nearly identical to the clothing worn by several men who perpetrated a series of armed robberies of Wawa convenience stores in the area.

16. Based on the evidence recovered from the vehicle, the investigators obtained a warrant to search the Defendants' cell phones, where they found additional evidence connecting the men to the Wawa robberies.

**DISCUSSION**

This case implicates several Fourth Amendment doctrines. First, the Defendants argue the officers' show of force transformed a valid temporary detention into a de facto arrest without probable cause. Second, the Defendants claim the officers improperly prolonged the traffic stop to perform a broader investigation into general criminal activity that was unrelated to the purpose of the stop. Third, the Defendants argue the officers had no authority to conduct a warrantless search of the trunk. Finally, Jackson claims he was subjected to a custodial interrogation without being advised of his *Miranda* rights. The Government argues the traffic stop was legal and, during a lawful temporary roadside detention of the Defendants, the officers developed probable cause to search the vehicle. The Court addresses these arguments in turn.

In a suppression motion challenging the constitutionality of a Fourth Amendment search or seizure, the government bears the burden of proof. *See United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)). The government must establish by a preponderance of the evidence that the law enforcement officers' conduct complied with the Fourth Amendment. *Id.* At the suppression hearing itself, "[c]redibility

determinations are uniquely in the providence of the [trial judge]." *Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974).

A Fourth Amendment seizure occurs "when a police officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *California v. Hodari D.*, 499 U.S. 621, 624 (1991). It is well established that a traffic stop of a vehicle is a Fourth Amendment seizure of the occupants, assuming the occupants comply with the police officer's commands. *See Brendlin v. California*, 551 U.S. 249, 256–58 (2007). The Fourth Amendment analysis begins where a search or seizure takes place. *See United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) ("The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred.").

Police officers are permitted to stop a car suspected of violating any applicable vehicle code or traffic laws. *See, e.g.*, *United States. v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)); *see also Terry v. Ohio*, 392 U.S. 1, 17 (1968). No further suspicion is needed. Once a law enforcement officer lawfully makes a valid stop, the officer may also take "such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo.'" *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). "Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Id.*

Here, it is uncontested that the traffic stop began lawfully. Although Officer McCauley attempted to pull the car over earlier in the night, the Fourth Amendment seizure began when Officer McCauley pulled behind the Nissan on Pine Street and instructed the driver and passengers

"[d]on't anybody move. Keep your hands out the window." Tr. 58:2–3. Officer McCauley personally saw the car operating with a broken taillight and expired registration on a public road. These traffic code violations were sufficient to authorize Officer McCauley to stop the Nissan. The goal of the stop, at the outset, was to investigate these vehicle code violations.

Traffic stops are inherently dangerous situations, and police officers are permitted to take certain precautions to ensure their safety. This includes directing a driver and passengers to exit the vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Maryland v. Wilson*, 519 U.S. 408 (1997) (extending *Mimms* to passengers). An officer may alternatively order the occupants to stay in the vehicle with their hands up. *See Bonner*, 363 F.3d at 216 (quoting *United States v. Moorefield*, 111 F.3d 10 (3d Cir. 1997)). Additionally, the officer may pat down the occupants of a vehicle and conduct a search of the passenger compartment if the officer reasonably suspects the occupants might be armed and dangerous. *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983) (permitting search of vehicle during traffic stop); *Mimms*, 434 U.S. at 111–112 (permitting pat down of driver upon reasonable suspicion); *Terry*, 392 U.S. at 17; *Moorefield*, 111 F.3d at 13–14 (permitting pat down of passenger upon reasonable suspicion).

The line between a *Terry* stop, which requires only reasonable suspicion, and a full-blown arrest, which must be supported by probable cause, is blurry. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). As the Third Circuit has recognized, "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010). Similarly, placing a suspect in handcuffs while securing the scene or conducting an investigation does not "automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Id.* When scrutinizing law enforcement's actions during a traffic stop, courts must give

7

deference to an officer's "knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *U.S. v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002). The Third Circuit has instructed district courts to avoid "second-guess[ing] the investigative decisions made by the law enforcement officers on the scene." *United States v. Edwards*, 591 F. App'x 156, 159 (3d Cir. 2014).

In this case, Officer McCauley, who had been a law enforcement officer and patrolman for approximately eleven years at the time of the incident,[5] took several safety precautions. Much of his experience was in Collingdale. He knew the neighborhood, the residents, and the type of criminal activity that sometimes occurred in the area. Officer McCauley had personally made hundreds of traffic stops, many of which resulted in the recovery of firearms. Officer McCauley was also alone at the outset of this particular traffic stop. Based on his training and experience, he decided to ask for backup before he engaged the three individuals in a dark, secluded area. Once backup officers arrived, Officer McCauley ordered the Defendants out of the vehicle and ordered the men to be temporarily detained before proceeding to address the mission of the stop. Given the nature of the stop, these precautions were reasonable.

In addition to ordering the Defendants out of the vehicle, Officer McCauley drew his weapon, put the men in handcuffs, and waited until at least four additional officers arrived. The Defendants cite various cases for the proposition that a show of force can transform a *Terry* stop into a de facto arrest that requires probable cause. However, these cases are neither binding nor persuasive.[6] Moreover, none of these cases explain why the Court should ignore the Third Circuit's

---

[5] Tr. 18:18–20:19.

[6] For example, in *United States v. Ceballos*, the Second Circuit held that police actions constituted a de facto arrest because the officers "articulated no facts which they viewed as creating a need for the use of force and a degree of intrusion beyond that generally employed in *Terry* stops." Thus,

8

clear finding that blocking a defendant's vehicle, drawing weapons, and eventually handcuffing the vehicle's occupants is justifiable if the officers had reasonable suspicion that the occupants were armed and dangerous. *Johnson*, 592 F.3d at 453. Officer McCauley testified at length about his experience in traffic stops like the one at issue in this case. He offered substantial justification for his suspicion that the Defendants may be armed, and given the circumstances of the stop, he took certain precautions to ensure his safety. He also reasonably believed the car was evading him. In short, the officers' decision to temporarily detain and frisk the Defendants was lawful. At this point in the interaction, the mission of the stop was to address the traffic violations.

A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). Officer safety precautions are nonetheless permissible, even if unrelated to the mission of the stop. *Mimms*, 434 U.S. at 110–11. However, an investigatory detention may become a de facto arrest by virtue of police officers' prolonging the stop longer than necessary to complete an investigation. Such an arrest requires probable cause.

Here, the traffic stop was not improperly prolonged. At the outset, the mission of the stop was to investigate traffic violations. In the course of taking the aforementioned safety measures,

---

the significant show of force was not justified. 654 F.2d 177, 183 (2d. Cir. 1981). Similarly, in *United States v. Butler*, the court held the defendant was arrested when he was removed from his vehicle at gunpoint and placed in handcuffs on the ground. 93 F. Supp. 3d 392 (W.D. Pa. 2015). In so holding, the court relied on the fact that the officers on the scene had no specific reason to believe that their actions were necessary under the circumstances. Unlike in *Butler*, Officer McCauley has provided a detailed, credible justification for his actions in this case.

The strongest case for the Defendants' argument is *United States v. Del Vizo*, in which the Ninth Circuit held that drawing weapons on a cooperative suspect, ordering him out of his vehicle, handcuffing him, and directing him to lie prone on the street exceeded the reasonableness limits of *Terry* and constituted an arrest. 918 F.2d 821 (9th Cir. 1990). However, this case is not binding on this Court, and contradicts clear Third Circuit precedent.

officers on the scene learned there was an unattended firearm in the car and that DeAndre Jackson was not permitted to carry a concealed weapon. This significantly changed the scope of the stop. Deputy Baker's decision to go inside the vehicle and retrieve the gun was a permissible intrusion based on the information he had just received. The police officers' actions up through the point at which Deputy Baker searched the passenger compartment were therefore constitutional.

In order to search a vehicle during a traffic stop, police officers must generally establish probable cause. The "automobile exception" to the warrant requirement permits law enforcement officers to search a vehicle without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir.1991). The government bears the burden of establishing the applicability of the exception by a preponderance of the evidence. *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir. 2014) (citing *United States v. Herrold*, 962 F.2d 1131, 1143 (3d Cir. 1992)). "[T]he scope of the warrantless search [authorized by the automobile exception] is no broader and no narrower than a magistrate could legitimately authorize by warrant." *United States v. Ross*, 456 U.S. 798, 825 (1982). There are two important requirements for the automobile exception. First, "[i]f probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

When Deputy Baker entered the passenger compartment to retrieve the gun, he testified he smelled marijuana. The Court credits this testimony. Deputy Baker was an experienced law enforcement officer who had recovered marijuana and other drugs on many occasions over the course of his career. Deputy Baker also credibly testified as to the difference between the odors of

fresh marijuana and burnt marijuana, leading the officers to believe there was some quantity of marijuana in the car. When the officers had not found marijuana in the passenger compartment, there was a legitimate basis to believe there was marijuana in the trunk. The odor of marijuana is sufficient to establish probable cause to search a car. *See United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006).[7] This authorized the officers to search any area of the vehicle where marijuana could be found. After searching the passenger compartment, and failing to find any marijuana, the officers then had probable cause search the trunk.

Finally, the Court addresses Jackson's Fifth Amendment argument. During a temporary detention at a traffic stop, it may be necessary for law enforcement officers to question a suspect. In general, law enforcement officers must inform a suspect in custody of their *Miranda* rights before questioning the suspect. *Miranda v. Arizona*, 384 U.S. 436 (1966). A suspect's *Miranda* rights are only implicated once two requirements are met: (1) the suspect must be in "custody," and (2) law enforcement officers must attempt to "interrogate" the suspect. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). However, there are exceptions to both the custody requirement and the interrogation requirement. For purposes of *Miranda*, a suspect in temporary detention during a routine traffic stop is not yet "in custody" for purposes of *Miranda*. *See Berkemer v. McCarty*, 468 U.S. 420 (1984). Moreover, "interrogation" does not include questioning relating to routine booking or on-scene safety concerns. *See Pennsylvania v. Muniz*, 496 U.S. 582 (1990); *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006). When the threat to public safety necessitates immediate questioning, no *Miranda* warnings are required. *See New York v. Quarles*, 467 U.S. 649

---

[7] Although this is the law in the Third Circuit, the Court notes there is a changing attitude towards marijuana in courts around the country and in Pennsylvania in particular, the odor of marijuana alone cannot establish probable cause to conduct a warrantless search of a vehicle. *Commonwealth v. Barr*, 266 A.3d 25, 44 (2021).

11

655-56 (1984) (response to officers' question about location of gun admissible under public safety exception because suspect arrested in supermarket wearing empty shoulder holster); *United States v. Fox*, 393 F.3d 52, 60 (1st Cir. 2004) (response to state trooper's inquiry regarding whether suspect had any weapons admissible under public safety exception because suspect had prior concealed weapons offense and bulge in pocket); *United States v. Ferguson*, 702 F.3d 89, 94 (2d Cir. 2012) (response to officer's questions regarding location of gun admissible under public safety exception because officer feared suspect had hidden gun in public place).

Deputy Baker's questioning of Jackson did not violate his *Miranda* rights. This interaction occurred during a temporary detention at a traffic stop. Jackson was therefore not in custody for purposes of the *Miranda* analysis. The questions were related to public safety and the presence of a loaded gun on the scene of a late-night traffic stop. Even if there were a *Miranda* violation, courts generally only suppress the testimonial evidence obtained in violation of *Miranda* and do not suppress physical evidence derived from an otherwise voluntary but unwarned confession. *See Michigan v. Tucker*, 417 U.S. 433, 451 (1974) (holding fruit of a *Miranda* violation admissible as evidence); *see also United States v. Patane*, 542 U.S. 630, 636 (2004) (stating the *Miranda* rule is prophylactic and employed to protect against violations of the Self-Incrimination Clause and is not implicated by admission into evidence of physical evidence from voluntary statement). Therefore, there are no *Miranda* issues presented in this case.

**CONCLUSION**

The officers' intrusions in this case were justified at each step throughout their interactions with the Defendants. There were no Fourth Amendment violations, and the Court will deny the Motions.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.